# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs March 19, 2003

## STATE OF TENNESSEE v. LATRECE JONES

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 226487    Rebecca J. Stern, Judge**

_____

**No. E2002-00893-CCA-R3-CD**
**September 15, 2003**
_____

A jury found the defendant guilty of criminally negligent homicide. The trial court sentenced her as a mitigated offender to .9 years of unsupervised probation. The defendant appeals her conviction and alleges that the trial court erroneously allowed the improper admission of evidence regarding child restraint laws and insufficient evidence to support a conviction. After careful review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Ardena J. Garth, District Public Defender, and Donna Robinson Miller, Assistant District Public Defender, for the appellant, Latrece Jones.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; William H. Cox, III, District Attorney General; and C. Parke Masterson, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

A Hamilton County Criminal Court jury found the defendant, Latrece Jones, guilty of criminally negligent homicide of her son, Carlon Bowens, Jr. The defendant was sentenced as a mitigated offender to .9 years in the Tennessee Department of Correction. The trial court ordered the defendant's sentence suspended, to be served on unsupervised probation. The trial court denied the defendant's Motion for New Trial. This appeal timely followed. The defendant contends there was insufficient evidence to support her conviction, and the trial court erred in allowing evidence regarding child restraint laws.

This case relates to the November 9, 1998 car accident in which the victim was killed. The defendant held the victim, her two-year-old son, on her lap while she rode in the front passenger seat of a rental sedan driven by Letitia Abernathy. Six other individuals were in the backseat. During the accident, the vehicle's air bags deployed. The only person wearing a seat belt was the driver. The victim sustained a broken neck and was declared dead a day and a half later by Erlanger Hospital physicians.

Officer Craig Joel, Investigator Gary Legg, Brooke Pippinger, Lisa McClain, Letitia Abernathy, Dr. Joseph Earl Kelley, Jr. and paramedics Billy Blea, Glen King, Scott Pryor, Jr., and Jake Carroll testified at the defendant's trial.

Officer Craig Joel testified that he has been a police information officer for the Chattanooga Police Department since January of 1998. He stated that he was a patrol officer in Zone 7, East Brainard area in 1998. Officer Joel testified that he was called to respond to a vehicle wreck at about 5:40 in the evening at or near the intersection of Shallowford Road and Jersey Pike. The prosecution showed the witness photographs of the accident, and Officer Joel said the pictures depicted the scene of the accident as he remembered it. He testified that one of the pictures accurately depicted the layout of the Jersey Pike and Shallowford Road intersection. Several of the pictures showed the rear of a white Chevrolet at an L-shape with a red Buick. Officer Joel testified that nine people occupied the Chevrolet and the airbags were deployed. He said the defendant told him that she was seated on the passenger's side of the Chevrolet without a seatbelt and held the victim. There were no child-restraint devices inside the Chevrolet. The defendant and Carlon Donyell Bowens, Jr. are the parents of the victim. On cross-examination, Officer Joel testified that the driver of the Buick LeSabre caused the accident by failing to yield, crossing in front of the white Chevrolet Cavalier.

Letitia Abernathy, aunt of the victim, testified that she operated a daycare business out of her home during November of 1998. She said that the automobile accident occurred at about 5:40 p.m. on November 9, 1998. At 2:00 p.m. that same day, she drove a rental car to her brother's house to pick him up for work. Three children from her daycare were passengers in her car at the time. The defendant and the victim, who was two years and four months old, were at her brother's apartment when she arrived. She testified that she and her brother were in the front seat and the victim, the defendant, and three daycare children were in the backseat. Ms. Abernathy drove her brother to his workplace, Planters, on Jersey Pike and dropped him off. The defendant and the victim got into the front seat. Ms. Abernathy wore a seat belt and thought the children were also wearing seat belts. She testified that there were no child-restraint seats in the car. After she dropped off her brother, she drove back to her home to pick up her daughter and a nine-month-old infant who stays in her daycare. Everyone got out of the car and then got back in the car after a couple of minutes. She said that when everyone got back into the car, the defendant and the victim sat in the front seat, and the five children sat in the back seat. She drove the defendant to Randstaff and dropped her and the victim off before picking her mother up at Childsplay. After she picked her mother up, she drove back to Randstaff to pick up the defendant and the victim. At this point, she had three adults and six children in her car.

At the time of the wreck, the defendant and the victim were seated in the front passenger seat. Her mother and four of the children were seated in the back seat, with one of the children holding an infant in her lap. She testified that at the time of the wreck she was on her way to Cromwell Road to drop off the defendant and the victim. Ms. Abernathy testified that her vehicle was hit from the rear at the intersection of Shallowford and Jersey Pike, and at the time of impact, the victim was sleeping and that she did not see any response from him. She said paramedics and emergency personnel responded within approximately six to eight minutes. She further testified that, with the exception of the victim, all of her other passengers were walking and talking. The victim was brought to the emergency room. She said that she has also been charged in the death of the victim and with violating the child restraint seat law and that her case has not been disposed of.

On cross-examination, Letitia Abernathy testified that she normally drives a Jeep which contains two car seats and carries up to five children in her car. She said that on the day of the wreck, one of her car seats remained in her Jeep and one was left at home. Ms. Abernathy testified that she only needed one car seat for the victim and one for the nine-month-old infant. One of the other children was under four years old. She further testified that although she wore a seat belt, she did not make arrangements to have child restraint seats for anyone in the car that day because there were too many people riding in the car. Ms. Abernathy testified that she did not expect to pick up all of the people that she had in her car. She said that earlier on the day of the wreck, she had a car accident in her van and called the day care parents to tell them that she would have difficulty transporting the children. She did not make arrangements to get a larger car to handle the size of the number of people she had to transport. She decided to transport them without child restraint seats. She testified that the defendant had nothing to do with the children sitting in the back seat of her rental car. She said there were only two lap belts in the back seat for the five people she transported. She stated that she has not been charged with failing to have a child restraint seat for the nine-month-old infant. Ms. Abernathy babysat the victim two or three times per week, but was not considered his care giver when he was with his father. She said that her brother was the victim's custodial parent, not the defendant. She testified that the victim has his own child restraint seat, but it was at his house on the day of the accident.

On redirect, Ms. Abernathy testified that she was aware of the fact that the younger children should have been in child safety seats. She said that at the time her daughter was born, she was instructed by Erlanger Hospital to have a car seat for her child. She did not know if any of the six individuals in the back seat were wearing a seat belt.

Jake Carroll, who works as program manager for the Tennessee Safety and Health Council and as a paramedic with the Hamilton County Emergency Medical Service, testified that he treated two of the passengers, ages three and four years old. He said that his two patients seemed to be in good condition, despite minor injuries.

Scott Pryor, Jr., a Hamilton County paramedic, testified that he was called to respond to a wreck on Shallowford Road and Jersey Pike between 5:45 p.m. and 6:00 p.m. on November 9, 1998.

He said that he was personally assigned to care for the driver, the nine-month-old infant, and another of the rear passengers. He testified that all three of his patients had minor injuries.

Glenn King, a Hamilton County paramedic, testified that on November 9, 1998, he was assigned to care for two of the passengers, ages six and seven years old. He said that one of the passengers sustained an abrasion to the lower right leg. He testified that he discovered that the children were not restrained in the car.

Billy Blea, a Hamilton County paramedic, testified that he determined that the victim was to be given priority for treatment. He said that the initial scene survey revealed several walking wounded with the victim receiving CPR from fire fighters on the scene. Blea testified that the victim was apneic and had no pulse. The victim was immobilized, and his airway was secured and intubated for breathing assistance. Paramedics had to decompress the victim's chest to help with the expansion of the chest and lungs to forcefully ventilate him. The victim was given intravenous drugs to help stimulate his heart. Blea testified that his initial primary survey of the victim revealed a hematoma to his forehead, but no other obvious injuries such as fractures or bleeding. As the victim was transported to Children's Hospital, he showed no signs of neurological responses and never regained consciousness or spontaneous respiration. Blea testified that the paramedics were able to get a pulse and blood pressure back on the victim, but he was still not breathing when they arrived at the emergency department. On cross-examination, Blea testified that "it's fairly obvious that" the victim's "injuries occurred from the wreck."

Lisa McClain, Administrator for the Women's and Infants Services Division at Erlanger Hospital, testified that she was the nurse manager of the Neonatal Intensive Care Unit (NICU) in July of 1996. She said that the victim spent four months in the NICU after his birth. Ms. McClain testified that it is the policy and procedure in effect at the NICU that "parents will place infant in car seat. Nurse may not place infant in car seat. If parent is unsure of proper usage of car seat, advise them to follow manufacturer's instructions. If car seat is not available, nurse must document in the nurse's notes and instruct parents to contact the Health Department for a loaner, and remind parents it is a Tennessee State law." She testified that between 1993 and 1997, parents being discharged from the hospital were given a pamphlet and a videotape concerning car seat safety. It has been the policy of the hospital to inform about car seat safety since June of 1988. The hospital's policy was given to the defendant at discharge. On cross-examination, she said that the original car seat policy was in effect from June of 1988 through May of 1996, and the second document concerning car seat safety went into effect in May of 1996. Ms. McClain testified that the old policy stated that "[i]nfants should be strapped into car seat by parents, according to State of Tennessee seat belt law" and that front or back seat was not covered specifically in the old policy. She testified that she would not have instructed parents on any criminal liability.

Brooke Pippenger testified that she was the assistant director of programs at the Children's Wellness Center in November of 1998. She said that the Children's Wellness Center is a program started by the Siskin Foundation to inform the community about how to prevent their children from injury. Her program provided the community with car seat checkup events free of charge and

provided the media with information on injury prevention. Her program was providing information to the media in October of 1997. On cross-examination, Ms. Pippenger testified that her organization provided information about the child restraint law, adult restraint law, and seat belt law. She said that she did not find any law making it illegal to put a child safety seat or a child in front of an air bag.

Gary Legg, investigator with the District Attorney's office, testified that he took photographs of the wrecked car driven by Letitia Abernathy. One of the photographs depicted the impact area on the windshield and the deployed air bag. Investigator Legg testified that there is a warning sign on each of the car visors stating: "Death or serious injury can occur children twelve months – or two and under, can be killed by the air bag. The back seat is the safest place for children. Never put front facing child seat in the front. Sit as far back as possible from the air bag. Always use seat belts and child restraints." On cross-examination, he testified that there is also a warning on the middle of the front passenger seat belt, but that he was reading the warning from the visor.

Dr. Joseph Earl Kelley, Jr., a pediatric surgeon at T.C. Thompson Children's Hospital and an assistant professor of pediatric surgery with the University of Tennessee College of Medicine in Chattanooga, testified that he was called to the emergency room to deal with the victim's injuries on November 9, 1998. The victim arrived with CPR in progress, was intubated, and was unstable from the standpoint of his blood pressure and pulse rate. He testified x-rays revealed that the victim suffered a broken neck. Dr. Kelley testified that there was too much separation between the base of the skull and the first vertebral body. He said that the victim "was not living on his own" when he arrived at the hospital. The victim died after two days of being maintained on ventilator support and medications for his heart rate and blood pressure. Dr. Kelley testified that the type of injury suffered by the victim is always fatal. He said that after neurosurgical consultation and confirmation by all of the other physicians, it was elected to discontinue life support to the victim. He testified that as a trauma surgeon, he has seen these types of injuries before. He further stated that there are no broken bones and that ligaments hold the vertebral bodies and the skull together on top of the vertebral column. Dr. Kelley said that the injury "comes most commonly from what we refer to as an extension and distraction injury so that there is a hyperextension of the neck and at the same time a distracting force that's pulling the skull off of the cervical column." He testified that the air bag deployment provides the distracting force for this injury.

On cross-examination, Dr. Kelley stated that the force of the unrestrained people in the back seat would have pressed against the people in the front seat. At the moment of impact, a combination of forces from opposite directions existed. Dr. Kelley testified that the pressure coming from behind would not have resulted in this kind of injury and that the deployment of the air bag caused the victim's death.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant claims that the evidence is insufficient to support the conviction of criminally negligent homicide, a Class E felony.

When a defendant questions the sufficiency of the evidence, our standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

### A. Evidence

The defendant claims that the evidence is insufficient to support her criminally negligent homicide conviction because the State failed to prove that the death of the victim was the direct and proximate result of the defendant's criminal negligence.

One is guilty of criminally negligent homicide if he or she engages in criminally negligent conduct which results in death. Tenn. Code Ann. § 39-13-212(a). The death of the victim must be the direct and proximate result of the defendant's criminal negligence. State v. Adams, 916 S.W.2d 471, 474 (Tenn. Crim. App. 1995).

Tennessee Code Annotated section 39-11-302(d) defines criminal negligence as follows:

> "Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding the person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

"In other words, the accused must know, or should know, that his or her conduct, or the result of that conduct, will imperil the life of another given the circumstances that exist when the conduct takes place." Adams, 916 S.W.2d at 474.

Testimony presented at trial revealed that the defendant knew that by failing to place her child in a child restraint seat, she was exposing her child to serious bodily harm or death. Testimony

from hospital personnel reveals that the defendant was verbally informed of child restraint laws and was given written information regarding the dangers of placing a child in the front seat of a vehicle equipped with air bags. The rental car in which the defendant and victim were riding displayed three warning labels regarding the danger of operating the vehicle with children under twelve in the front seat and the reminder to always use seat belts and child restraints. The two warning labels on the vehicle's visors read as follows:

> ! WARNING
> DEATH or SERIOUS INJURY can occur
> !   Children 12 and under can be killed by the air bag.
> !   The BACK SEAT is the SAFEST place for children.
> !   NEVER  put a rear-facing child seat in the front.
> !   Sit as far back as possible from the air bag.
> !   ALWAYS use SEAT BELTS and CHILD RESTRAINTS.

Testimony also revealed that the defendant and her ex-husband possessed a child restraint seat and had used it to transport the victim on other occasions. Furthermore, during the year prior to the accident, assorted public service announcements in print and television were circulated regarding the importance of using child restraint seats.

The evidence demonstrates that the defendant's conduct was the proximate cause of the victim's death. Testimony reveals that the defendant put the victim into the Abernathy's overcrowded vehicle three times on the day of the incident and placed the victim on her lap on each occasion. The defendant did not use a seat belt for herself or place her child in a child restraint seat prior to the accident. The defendant repeatedly ignored the warnings that the passenger side air bag could kill or seriously injure her child. The evidence demonstrated that the victim died when his neck was broken  as a result of the force of his body moving forward and the force of the air bag moving in the opposite direction. None of the back seat passengers sustained serious injuries, despite their not being in proper restraints. The evidence clearly demonstrates that the victim died because the defendant placed the victim in her lap in front of a passenger-side air bag, as opposed to placing him in a child restraint device in the back seat of the vehicle.

## B.  Jury Charge

The defendant contends that the trial court erred in instructing the jury regarding proximate cause. The defendant states the jury was instructed that in order "to find the defendant guilty of criminally negligent homicide, the State must have proven beyond a reasonable doubt the following essential elements: 1) that the defendant's conduct resulted in the death of the victim; and 2) that the defendant acted with criminal negligence." The defendant states the jury was told "it is only necessary that the defendant unlawfully contributed to the death of the deceased" and that the "intervening cause is no defense . . . if in any other way the defendant contributed to the death of the deceased." The defendant argues that the trial court's instructions regarding "contribution" is "too tenuous a causal connection to meet the requirement of proximate cause." The State argues that the

defendant's challenge is without merit because the "concepts of merely contributing to a result and being the proximate cause of a result are not mutually exclusive." We agree with the State that the concepts of contributing to a result and being the proximate cause of a result are not mutually exclusive.

An accused is entitled to a complete and correct charge of the law. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). We review a jury charge to determine if it fairly defined the legal issues involved and did not mislead the jury. See State v. Hall, 958 S.W.2d 679, 696 (Tenn. 1997). We review the jury instruction in the context of the overall charge rather than in isolation. See Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). Erroneous jury instructions require a reversal, unless the error is harmless beyond a reasonable doubt. See Welch v. State, 836 S.W.2d 586 (Tenn. Crim. App. 1992).

At trial, the court gave the following instruction regarding cause of death:

> Before the defendant can be convicted of any degree of homicide, the State must have proven beyond a reasonable doubt that the death of the deceased was brought about as a result of the criminal agency of the defendant; that is, that the death of the deceased was due to the unlawful act, i.e., the criminal negligence, of the defendant . . .
>
> To convict the defendant it is not necessary that her act or failure to act be the sole cause, nor the most immediate cause of death. It is only necessary that the defendant unlawfully contributed to the death of the deceased.
>
> Where it appears that the death was not caused by the defendant, but by an independent, intervening cause, with which the defendant was in no way connected, such intervening cause is a good defense to a charge of homicide. However, the intervening cause is no defense if it was the natural result of the defendant's act, or if in any other way the defendant contributed to the death of the deceased.

If you find that the defendant's act, if any, did not unlawfully cause or contribute to the death of the deceased, or if you have a reasonable doubt as to this proposition, then you must acquit her.

In the instant case, the jury instructions required that the death must be due to the defendant's unlawful act. As discussed previously, the evidence established that the defendant's conduct substantially contributed and directly caused the death of the victim. We conclude that the jury instructions were not misleading. Reviewing the jury instructions as a whole, it appears that the jury members were clearly instructed regarding the legal issues at hand. We conclude that the defendant's jury was given clear, complete, and accurate instructions.

## II.  Admission of Evidence

The defendant contends that the trial court erred in denying her new trial motion, claiming the improper admission of evidence about Tennessee law requiring restraint of children under age four in moving vehicles as well as evidence about the absence of any car seats in the vehicle.  The defendant claims that this evidence was irrelevant and prejudicial.  See Tenn. R. Evid. 401, 403.  The defendant argues that she did not have a statutory duty to place her son in a child restraint seat and no evidence demonstrated that a child restraint seat would have protected the victim from the deployment of an air bag.  The State argues that the evidence was relevant to show the defendant ignored well-known risks to the victim.

According to Rule 401 of the Tennessee Rules of Evidence, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Tenn. R. Evid. 403.  The trial court has discretion in determining whether evidence meets the test for relevancy.  State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).  Assessing the probative value and danger of unfair prejudice regarding the evidence also falls within the trial court's discretion.  State v. Burlison, 868 S.W.2d 713, 720-21 (Tenn. Crim. App. 1993).  This court will only reverse a trial court's decision if the trial court abused its discretion.  State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995).

The evidence contested by the defendant relates to the testimony of the State's witnesses regarding information dispersed by the media into the community about the child restraint law, adult restraint law, and seat belt law.  The State's witness also stated that her program provided the community with car seat checkup events.  The record does not reflect that the defendant's attorney objected to the testimony on the basis of relevance.

We conclude that the evidence is relevant to make a contribution to the State's total case to demonstrate that the defendant had, in many instances, been made aware of the danger of placing her child in her lap while in a moving vehicle.

Tennessee Code Annotated section 55-9-602(a)(1) requires that "any person transporting a child under four (4) years of age in a motor vehicle upon a road, street or highway of Tennessee is responsible for providing for the protection of the child and properly using a child passenger restraint system meeting federal motor vehicle safety standards."

We conclude that the trial court did not err in allowing the State's witness to testify regarding media coverage and statewide programs involving community awareness of child restraint seats.  The defendant has failed to show how she was prejudiced by this testimony.  Furthermore, the evidence established that the victim was killed because he was sitting in the defendant's lap in the front seat of a moving vehicle when the vehicle's air bag deployed.  The defendant argues that her right to a fair trial was compromised by the State's introduction of evidence about the lack of a child

restraint seat and because the jury was permitted to consider multiple criminal acts of alleged negligence throughout her ride with Abernathy, the driver of the rental vehicle. The defendant argues that restraining the victim in the front seat would not have protected the victim from the air bag. The testimony establishes that the defendant chose to ignore signs in the rental car warning her of risks to the victim of placing her child in the front seat with or without child restraint seats. Furthermore, testimony revealed that the victim had his own child restraint seat, but, sadly, no one chose to use it on the day of the accident.

**Conclusion**

Based on the foregoing, the judgment of the trial court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE